**EDWARD CRUMP, Jr., Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9609.

Circuit Court of Appeals
Third Circuit.

Argued May 18, 1948.

Decided Aug. 23, 1948.

Sidney B. Gambill, of Pittsburgh, Pa. (W. A. Seifert, William Wallace Booth, Norman D. Keller, and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for petitioner.

Harry Marselli, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key and George A. Stinson, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BIGGS, McLAUGHLIN, and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The question involved in this appeal is whether, under the particular facts of the case, the taxpayer in its excess profits return for 1942 was entitled to elect to compute the income from a long-term contract on a percentage of completion method of accounting in accordance with Section 736 (b) of the Internal Revenue Code, 26 U.S. C.A.Int.Rev.Code, § 736(b).[1]

---

[1] Section 736(b), which became effective in 1942, reads:

"(b) Election on long-term contracts.—

In the case of any taxpayer computing income from contracts the performance of which requires more than 12 months.

The taxpayer is a Pennsylvania building construction corporation. It kept books on a calendar year basis. The income tax returns through 1942 were made on a completed contract basis. The only long-term contract as defined in Section 736(b) (performance of which requires more than twelve months) it ever had was the one in question. Work thereon started in the fall of 1940, continuing through 1941, and was completed in the spring of 1942. Prior to filing the corporation's 1941 returns, Edward Crump, Jr., president and treasurer of the company, was aware of the fact that higher excess profits tax rates would apply in 1942. He discussed the matter with a Mr. Sabel, an accountant and officer of the petitioner. He told Sabel that as the contract was practically completed at the end of 1941, the profit from it should be reported in that year, and this was done. Sabel explained this in his testimony as follows:

"Q. How did you determine in the 1941 Return the profit of $25,359.26? A. The total cost of the contract to the end of 1941 was determined, and that was subtracted from the total amount of the billings to December 31, 1941.

"Q. Were any adjustments made to those figures, and, if so, why? A. *Included in those figures was the amount that was computed to be necessary to complete the* contract *in costs and the necessary billings to complete the contract, to the total billing price as of that date.*

"Q. Now, you are thinking about the original contract of $369,000? A. *No, I am thinking about the original contract plus those additions and change orders which have been received in 1941.*

"Q. Now, assume that the Government is correct—which we must assume now—that only one contract was involved, and that the original contract of $369,000, which is Exhibit 1, plus all the change orders and additions and omissions constituted one and only one contract, which was completed sometime in 1942, did you report in the 1942 Return the method—strike that—did you report in the 1942 Return the income from that contract on a completed contract basis? A. No, sir.

"Q. On what basis did your method constitute, from an accounting standpoint? A. We reported in 1942 the work which was performed in 1942, and in 1941 the work which had been performed, and the profit made up to the end of 1941." (Emphasis added.)

The 1941 return was filed prior to the enactment of Section 736(b). Petitioner makes no claim that Section 721(a) (2) (B) as amended by Section 5 of the Excess Profits Tax Amendments of 1941, 55 Stat. 17, 26 U.S.C.A.Int.Rev.Code, § 721(a) (2)

if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence, it may elect, in its return for such taxable year for the purposes of this subchapter, or in the case of a taxable year the return for which was filed prior to the date of the enactment of the Revenue Act of 1942, within 6 months after the date of the enactment of such Act, to compute, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, such income upon the percentage of completion method of accounting. Such election shall be made in accordance with such regulations and shall be irrevocable when once made and shall apply to all other contracts, past, present, or future, the performance of which required or requires more than 12 months. The net income of the taxpayer for each year prior to that with respect to which the election is made shall be adjusted for the purposes of this subchapter, including the computation of excess profits net income in each taxable year of the base period under section 711 (b) to conform to such election but for purposes of chapter 1, the tax imposed by this subchapter for any prior taxable year on account of the adjustment required by this subsection shall be considered a part of the tax imposed by this subchapter for the taxable year in which such income is, without regard to this subsection, includible in gross income. Income described in this subsection shall not be considered abnormal income under section 721." (26 U.S.C.A. Int.Rev.Code, § 736.)

(B), was intended to apply to its 1941 return. That provided in principle relief similar to that in the later Section 736(b). The testimony for petitioner as seen indicates that a completed contract method of accounting was contemplated.

Petitioner's 1942 returns were also prepared under Sabel's direction, and the 1942 profit under the particular contract was stated. This amounted to $6,778.29. The total profit realized from the contract was $32,137.55. There is no mention of the contract in the excess profits returns or the income tax returns for either 1941 or 1942. The return for 1942 carried the following question: "(g) Does this return involve an adjustment of the excess profits tax liability due to the application of the sections specified in (1) below?" It was answered "No." The (1) referred to reads as follows: "* * * If the answer is 'Yes' (1) Check the appropriate sections and submit schedules showing computation: * * * 736(b) □ * * *" No indications appear.

The Commissioner in determining the deficiencies for the two years included the entire profit from the contract in each of the years. The 1941 assessment was merely protective. It is agreed that the contract was not finished until 1942.

The Tax Court found that the petitioner in its 1942 excess profits tax return having "expressly renounced the elective change in method, rejection of its claim to adopt it is required", and so sustained the deficiency.

The government forcibly argues that petitioner in 1941 expressly reported on the completed contract method, that it followed this in 1942 by so stating in its income tax return with nothing to the contrary in its excess profits tax return, and therefore the taxpayer is not entitled to any inference that in 1942 it elected to report on a percentage of completion basis. It cannot be denied that petitioner did attempt to compress the entire contract into the 1941 income but was unsuccessful because, unexpectedly, considerable work under it developed for 1942, the profits for which had to be reported that year. Petitioner, urging that the actual treatment of income in a return fixes the method chosen for treating such income, contends that having set out in its 1941 return the profit from the contract of that year, with the 1942 profit reported in its 1942 return, it has established a percentage of completion method for those years. This is difficult of acceptance in view of the at least ambiguous nature of the testimony.

Three decisions are stressed for the petitioner. The first is Boone County Coal Corporation v. United States, 4 Cir., 121 F. 2d 988, 992, which concerned a different statute and regulation. It does, however, stand for the proposition that where certain costs were treated as capital within the critical period it will be considered that an election had been made which the taxpayer could have changed "by a timely amended return for the year in question, but not by an untimely return filed at a time which could not have been within any extension that the Collector of Internal Revenue was legally authorized to grant." The next decision, Commissioner v. Sklar Oil Corporation, 5 Cir., 134 F.2d 221, 223, stands for the same rule. The court said, 134 F. 2d at page 223, "Taking these undisputed evidences of intention to expense all of these optional items, in connection with the undisputed fact that the taxpayer did actually expense some of them in its 1933 return, the board concluded that the regulation was sufficiently complied with". The court thus agreed with the decision of the then Board of Tax Appeals. The third case is Ethyl Corporation v. United States, Ct.Cl., 75 F.Supp. 461, 466, where the taxpayer inserted "None" under the return item of credit for foreign taxes paid, and then set down a sum on which such credit was sought. The court allowed the credit since the word "None" could not reasonably be explained with the entry of the credit figure on the return form.

Plainly, this last decision does not touch the facts before us. The taxpayer was not just given the benefit of the doubt in the inconsistency existing between its answer and the credit figure it claimed with reference to the same foreign tax. Under the particular circumstances the court found, " * * * we are not left in any doubt that the taxpayer intended to claim such credit." Nor do we think that the

Sklar or Boone County opinions are here controlling. The vital distinction between them and the matter at bar is that, in the latter, we do not have the unequivocal election through the use of an accounting method such as existed in those cases. The 1942 figures might possibly be taken as suggesting a percentage of completion basis, or, with considerably more justification, as indicating the unexpected 1942 profit on a contract the profit of which was previously thought to have been made all in 1941. This would have been a reasonable interpretation, having especially in mind that the 1941 return carried an estimate of the total contract profit. Certainly we cannot say that the Tax Court had no warrant for holding that the necessary election to compute on percentage of completion was not made.

■ Petitioner further argues that it in reality did comply with the requirements of Treasury Regulations 112, Section 35.-736(b)-2 issued pursuant to Section 736(b) of the Code and that its answer to the question on the return was correct. It states that the Regulations set forth three things which were to be done in order to make the election. The first is the filing with the return of a comparison schedule of the gross income from its long-term contracts. It concludes from this that since it had only one long-term contract there was nothing to compare. The second requirement is to file a schedule showing recomputation of the average base period net income and the excess profits net income for each year in the base period with income from long-term contracts computed upon the percentage of completion method. Petitioner says that it had no such long-term contract income in its base period. The third requirement is for the filing for certain amended excess profits tax returns in connection with long-term contracts. Petitioner says this was unnecessary because when it elected in its 1942 return to report on the percentage of completion method it had already reported its sole long-term contract in 1941 on that method.

Substantially, petitioner asserts that it did not have to answer "Yes" to the question of adjustment on the return because it had no adjustment to make. By what seems to have been a fortunate coincidence, petitioner's method of return produced figures almost identical with those it would have reported had it chosen the percentage of completion method.[2] It cannot be inferred from this that the election was made. The strong inference to the contrary is that the argument has "the benefit of hindsight", which, as the Supreme Court has held, will not permit a "shift from one basis * * * to another in light of developments subsequent to their original choice." Riley Investment Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36.

■ As we have already indicated, there is factual support in the record for the Tax Court's conclusion that the taxpayer had not made the claimed election in its 1942 tax return. That holding cannot be disturbed on review.

The decision of the Tax Court will be affirmed.

---

[2] The inclusion of 1942 estimated income in the 1941 return could have made this greater than the percentage of completion method would have done. But we have no figures before us on this point.